# Richmond.

## COLLINS DENNY, JR., ADMINISTRATOR, ET AL. V. JOHN R. SEARLES, ADMINISTRATOR, ET ALS.

### May 24, 1928.

1. WILLS—*Construction—Bequest of Trust Estate to Daughter and of the Residuary Estate to Testator's Wife—Case at Bar.*—In the instant case testator, after bequests to his mother and executor, gave to his executor the sum of $100,000.00 to be held as trustee for the benefit of his adopted daughter. He then devised and bequeathed all the rest and residue of his estate to his wife.

   *Held:* That by the terms of the will the daughter was given in trust a pecuniary legacy of $100,000.00, which was a paramount charge upon the residuary estate given her mother.

2. WILLS—*Construction—Bequest of Trust Estate to Daughter and of the Residuary Estate to Testator's Wife—Meaning of Residue of Estate.*— Where the provision of a testator for his widow is of the residue of his estate, the residue means such estate as remains after the payment of debts, costs of administration, and payment of all other bequests and devises.

3. WILLS—*Legacies—From what Time Pecuniary Legacy Bears Interest— Case at Bar.*—As a general rule a pecuniary legacy becomes payable one year after the date of the qualification of the personal representative, and, if not then paid, begins to bear interest. But such interest is not charged under all circumstances, and each case must depend upon its own peculiar circumstances, and in the instant case where a testator gave in trust a legacy of $100,000.00 to his daughter, and provided further that his widow should take his residuary estate, the effect of the renunciation of the widow upon the disposition of the estate by the will should be considered in determining the question of the proper allowance of interest to the legatees.

4. WILLS—*Construction—Renunciation by Widow—Presumption that Testator Knew Widow's Rights.*—The law conclusively presumes that when testator made his will, he knew that his widow by statute was entitled to one-half of his personal property after payment of his debts and costs of administration, and that he could not deprive her of her statutory estate without her consent, and

that if she elected to take against the will, her election ordinarily and almost necessarily interfered with his scheme for the distribution of his estate.

5. WILLS—*Election by Widow Against Will—Effect of Election on Devises and Bequests.*—The general rule is that the election of a widow to take against her husband's will does not invalidate the will as to devises and bequests to others, except so far as the property given thereby may be necessary to satisfy the claim of the widow under her election, and hence it is the duty of the court to protect the rights of others claiming under the will, and to carry out the provisions thereof, if not in the precise mode directed by the testator, yet in as near that mode as possible.

6. WILLS—*Effect of Renunciation of Will by Widow.*—Where a testator after several legacies gave the residue of his estate to his widow, the legal effect of the widow's renunciation of the will was that the gift of the residuary estate to her never came into existence. It was annulled and blotted out of the will.

7. WILLS—*Construction—Bequest of Property in Trust to a Daughter—Residue of Estate to Widow—Renunciation of Will by Widow—Case at Bar.*—A will bequeathed property in trust to the adopted daughter of testator to be held by the trustee until she should arrive at the age of twenty-five years; the income to be paid to the daughter for her support and maintenance; the principal to be paid to the daughter when she should arrive at the age of twenty-five. If, however, the daughter should die before arriving at the age of twenty-five without issue, the principal should fall into the residue of the estate. There were other small legacies and the testator then gave the residue of his estate to his widow. The widow elected to renounce the will. The legal rights of the parties to the estate after the widow's election were as follows: The widow was entitled independently of the will to one-half of the estate by virtue of the statute, and the other half thereof was the fund from which the executor must pay the legacies provided for in the will. The adopted daughter's legacy was a vested interest, subject, however, to be divested by the contingency of her dying before attaining the age of twenty-five and without issue, in which event the legacy reverted to the next of kin of the testator.

8. EXECUTORS AND ADMINISTRATORS—*Legacy in Trust for Daughter—Provision that Widow should have Residue of Estate—Renunciation of Will by Widow—Assets not Sufficient to Set Up the Trust Fund for the Daughter—Duty of Executor—Case at Bar.*—In the instant case testator left his adopted daughter a legacy of $100,000.00 in trust and gave his widow the residue of his estate. The widow elected to renounce the will. Testator also provided for two other small legacies. It was manifest that if the executor sold the assets, he would not

realize much more than half enough to pay the legacies and the widow. The executor brought the assets and the parties before the court, in order to carry out the provisions of the will, if not in the precise mode directed by the testator, yet in as near that mode as possible.

*Held:* That under the circumstances the executor did what the law required him to do. ·

9. WILLS—*Legacies and Devises—When Legatee Entitled to Interest—Exception to the General Rule—Case at Bar.*—Where a legacy is given by immediate bequest, and there is a condition to divest it upon the death of the legatee under twenty-five (as in this case) with limitation over, and the legatee dies before twenty-five, yet, as the legacy under the general rule in Virginia, was payable at the end of the year after the qualification of the personal representative, the legatee, and not the legatee over, will be entitled to the interest which accrues during the legatee's life, until the happening of the event which was to divest the legacy. This rule is subject, however, to the exception that where maintenance or interest is given by the will, and the rate specified, the legatee will not, in general, be entitled to claim more than the maintenance or rate specified.

10. WILLS—*Legacies and Devises—When Legatee Entitled to Interest—Exception to the General Rule—Case at Bar.*—In the instant case the testator gave a trust fund for his daughter, subject to be divested in case she died before attaining the age of twenty-five and without issue. Testator gave his widow the residue of his estate. Testator provided that "the income from said sum of money to be paid to my said daughter for her support and maintenance in quarterly installments at least." The widow elected to renounce the will.

*Held:* In view of the presumption that testator knew the character of the estate, his intent was to limit the daughter's claim to maintenance and support to the actual income which accrued upon the sum invested instead of interest from the end of the year after the qualification of the first representative, otherwise the daughter's legacy would have greatly encroached upon the residuary legacy, and given her support and maintenance out of the principal of the estate.

11. EXECUTORS AND ADMINISTRATORS—*Non-Income Producing Assets Insufficient to Set Up a Legacy in Trust but which May by Liquidation Become Sufficient—Duty of Executor—Case at Bar.*—Where non-income producing assets came into possession of an executor which at the end of the year after his qualification were plainly insufficient at that time to set up the principal of a trust legacy bequeathed by the will, but, in view of experience and sound business judgment, would by liquidation yield funds sufficient, or nearly so, to set up

the principal, notwithstanding there was a contingency annexed to the gift of the fund to the beneficiary whereby the same might be divested, the law and common business sagacity makes it the duty of the executor to manage said assets so that by liquidation and enhancement of value, the principal fund will be realized, even at the loss of the income, especially where the principal and income are given to the same person.

12. WILLS—*Legacies and Devises—Time from which Legacy Bears Interest—Assets not Sufficient to Set Up a Trust Legacy a Year After the Qualification of the Representative—Case at Bar.*—In the instant case testator directed that a trust fund be set up for the benefit of his daughter subject to be divested if she should die before attaining the age of twenty-five without issue. The assets in the hands of the representative at the end of the year after his qualification were insufficient to set up the trust fund, but by liquidation and enhancement of value it was apparent that they would yield funds sufficient, or nearly so, to set up the principal.

   *Held:* That under the circumstances of the case, and in view of the character of the estate and the intent of the testator, the legacy of the trust fund was exempt from the general rule that legacies bear interest after the end of the year from the qualification of the personal representative. The trial court was right in not charging the executor or the estate with interest except upon the sums which came into his hands for distribution.

13. WILLS—*Legacies and Devises—Time from which Legacy Bears Interest.*—The rule that a legacy bears interest from the end of the year after the death of the testator is the general rule (subject to exceptions) established by the chancellors of England, and adopted by all of the States. In Virginia, however, by statute interest begins to run from the end of the year after the qualification of the personal represantative.

14. WILLS—*Legacies and Devises—Time from which Legacy Bears Interest—Duty to Inform Opposing Counsel—Knowledge of Law.*—The question of the application of the general rule of law in regard to interest on a pecuniary legacy was a matter of law, and not fact, apparent on the face of the record, and it was not the legal duty of counsel to inform the opposing counsel of so well-established and general rule of law.

15. FRAUD AND DECEIT—*Withholding Knowledge of Material Facts—Matters of Law—Case at Bar.*—Withholding material facts to an agreement by a party from the other contracting party of which he is ignorant, is a suppression which may amount to fraud, but this rule does not apply to matters of law especially where the negotiations were conducted by attorneys of the character, ability and learning of those who managed the transaction in queston.

16. JUDGMENTS AND DECREES—*Consent Decree—Decree Approving Release of Rights in Estate—Case at Bar.*—In the instant case it was asserted that a decree approving and confirming the release and assignment by the husband and administrator of a legatee of their rights in the estate was a consent decree, and that the attorney for the administrator did not endorse his request for its entry thereon.   Upon its face the decree was not a consent decree, but an ordinary decree entered by the court with the recital "and was argued by counsel," which at least signified knowledge of all counsel of its entry.   The decree, therefore, is unimpeachable except for fraud or perhaps for clear mistake on the part of the court.

17. JUDGMENTS AND DECREES—*Conclusiveness of Recitals—Release by Administrator—Case at Bar.*—In the instant case a decree approving and confirming the release and assignment by the husband and administrator of a legatee of their rights in the estate recited that all parties in interest desired the court to approve the release and settlement.   The decree was asked for by writing on the back thereof signed by counsel for all parties in interest, except counsel for one party who testified that he did not know about the decree.   At the most, this was a question of mistake of the court.   The learned chancellor had a perfect right to deny (without becoming a witness) that such a mistake was made, and the recitals of the decree are conclusive.

18. FOREIGN JUDGMENTS AND DECREES—*Collateral Attack—Judgments of Probate Courts—Full Faith and Credit.*—Judgments of probate courts of the States appointing personal representatives, determining the succession of property, and distributing the assets are in the nature of proceedings *in rem*, and are protected by the "full faith and credit" provision of the Constitution from collateral attack in any other State except upon jurisdictional grounds.

19. FOREIGN JUDGMENTS AND DECREES—*Collateral Attack—Judgments of Probate Courts—Full Faith and Credit—Jurisdiction.*—When, however, full faith and credit is demanded for a judgment in the courts of other States, an inquiry into the jurisdiction is always permitted, and if it be shown that the proceedings relied upon were without the jurisdiction of the court, they need not be respected.

20. EXECUTORS AND ADMINISTRATORS—*Jurisdiction—Domicil of Decedent.*—The jurisdiction of the courts of a State to administer an estate and adjudicate its succession depends upon the fact of the domicil of the decedent, except as to real estate.

21. EXECUTORS AND ADMINISTRATORS—*Jurisdiction—Domicil of Decedent—Conclusiveness of Judgment.*—The judgment of a court taking jurisdiction of the estate of a decedent is conclusive of the fact of domicil of the decedent against every one until successfully impeached in another State, but it is open to the courts of any other State, in the

trial of a collateral issue, to determine upon the evidence produced, the true domicil of the deceased.

22. EXECUTORS AND ADMINISTRATORS—*Jurisdiction—Domicil of Decedent—Case at Bar.*—While in the instant case the Virginia court was not called upon by the parties to explicitly decide upon the question of the jurisdiction of a Michigan court to administer the estate of a legatee, the question was raised in the pleadings and evidence offered thereon, and was so essential to its power to determine the issue between the parties that its decision that the Michigan court had jurisdiction is conclusive against everyone in the suit.

23. EXECUTORS AND ADMINISTRATORS—*Jurisdiction—Domicile of Decedent—Estoppel—Inconsistent Position—Case at Bar.*—The fact that testator's next of kin denied the jurisdiction of a Michigan court to administer the estate of a legatee and undertook to prove that the legatee's domicil was in Pennsylvania in which they failed and subsequently dealt with the Michigan administrator as her proper domiciliary administrator, is not such inconsistent position in this cause as prevents them from denying that the legatee was ever domiciled in Pennsylvania. They have merely admitted that the probate court of Michigan was the proper forum wherein the legatee's estate should be administered.

24. EXECUTORS AND ADMINISTRATORS—*Judgment Appointing Administrator—Conflict of Laws.*—A judgment of a court of the State of decedent's domicil appointing her administrator gives the administrator as a general rule the right to receive and administer her estate according to the laws of that State and under the jurisdiction of its courts.

25. WILLS—*Descent and Distribution—Jurisdiction—Executors and Administrators—Conflict of Laws.*—In respect to the settlement of the succession to property on death the States of the Union are sovereign and may give to their judicial proceedings such conclusive effect, as provided by statute, subject to the requirements of due process of law and to any other constitutional limitation which may be applicable.

26. EXECUTORS AND ADMINISTRATORS—*Ancillary Administrator—Domiciliary Administrator—Case at Bar.*—In the instant case a decedent's estate was to be administered according to the laws of Michigan, and whether distribution ought to be made by the domiciliary administrator, or the ancillary administrator, depended upon the circumstances of the case.

27. EXECUTORS AND ADMINISTRATORS—*Ancillary Administrator—Domiciliary Administrator.*—Where there has been a principal administration in one State, and an ancillary administration in another, whether the courts of the latter will permit the assets there being to be transferred to the former, before the legatees as well as the creditors in the State of the ancillary administration are satisfied,

will depend upon the circumstances of each case.   There is no in-flexible rule on the subject.

28.  JUDGMENTS AND DECREES—*Decree Approving Release of Rights in an Estate—Non-Residence of Party Claiming Interest.*—The validity of a decree approving and confirming the release and assignment by the husband and administrator of a legatee of their rights in the estate is not impaired by the non-residence of one claiming to be the father and heir of the legatee.

29.  EXECUTORS AND ADMINISTRATORS—*Devastavit—Administrator Joining Pro Forma with Non-Resident Administrator—Case at Bar.*—A compromise was made *in pais* with the non-resident administrator by the non-resident next of kin of a decedent, and the Virginia administrator received nothing and merely joined with the non-resident administrator *pro forma*, therefore the Virginia administrator was in no sense guilty of a *devastavit*.

30.  EXECUTORS AND ADMINISTRATORS—*Compromise or Release—Conflict of Laws—Domiciliary Administrator—Burden of Proof.*—Whether a compromise or release made by the Michigan administrator of a decedent domiciled in Michigan at the time of her death was valid and binding must be determined by the laws of Michigan, and the burden of proof is upon the party claiming it to be invalid to prove that it was invalid under the laws of Michigan.

31.  EXECUTORS AND ADMINISTRATORS—*Conflict of Laws—Rights of Legatee Under Will of Resident of Virginia.*—Where a Virginia court was administering the estate of a resident of Virginia at the time of his death, the rights of a legatee under his will are to be determined by the Virginia statute.

32.  EXECUTORS AND ADMINISTRATORS—*Conflict of Laws—Estate of Legatee Under the Will of a Virginia Resident—Legatee Resident of Another State.*—When the legatee, under the will of a resident of Virginia at the time of his death, died domiciled in Michigan, her estate passed to her administrator to be administered according to the laws of Michigan.

33.  EXECUTORS AND ADMINISTRATORS—*Priority of Claims—Debts First Charge on Estate—Law of Domicil.*—In all jurisdictions the first charge against the estate of a decedent are the debts.   These must be determined by and in the State of the domicil, except local creditors in other States in which are assets, and paid before there is any distribution.

34.  EXECUTORS AND ADMINISTRATORS—*Compromise and Settlement— General Rule—Compromise of Claims against Estates—Conflict of Laws— Forum of Domicil.*—The general rule of compromises by administrators is that an administrator has the right to demand and receive from an executor or administrator the share of an estate due to his decedent.   And to this end he has power to settle and com-

promise with him, with a view to the interest of the estate. It is true that in such transactions he may lay himself liable to *devastavit*, but if he acts fairly, in good faith, and with a due regard to the interest of the estate the distributees will be bound by his acts, and he will be protected. The forum of the domicil is to determine his liability.

35. BASTARDS AND BASTARDY—*Legitimation—Jurisdiction—Case at Bar.*— Whether a legatee of a testator, a resident of Virginia, was the natural daughter of testator and had been recognized by him, so that she became legitimized and was his sole distributee, was a matter of Virginia law, determined by Virginia statutes, and the Virginia courts were the forum for the trial of that issue.

36. EXECUTORS AND ADMINISTRATORS—*Distribution—Who are Distributees—Question of Forum of Domicil—Case at Bar.*—Who are the distributees of a legatee was a subject of determination for the forum of the legatee's domicil.

37. EXECUTORS AND ADMINISTRATORS—*Duties of Administrator.*—It is the duty of an administrator by virtue of his appointment to demand and receive the estate of his decedent, to ascertain her debts, who were her distributees and report to the court for its administration.

38. EXECUTORS AND ADMINISTRATORS—*Administration—Proceeding in Rem—Conclusiveness of Proceeding.*—The administration by a court of the estate of a decedent is a proceeding *in rem* and when done is conclusive upon residents and non-residents unless there is some reservation of their rights provided by the law of the forum.

39. DESCENT AND DISTRIBUTION—*Petitioner's Claim to be Father of Decedent not Supported by Sufficient Evidence.*—In the instant case petitioner claimed to be the father of deceased legatee and her sole heir. This claim was based upon his own uncorroborated evidence. His neighbors and relations impeached his evidence and testified that they would not believe him on oath. His account of his marriage the the legatee's mother, and the legatee's paternity did not appear credible.

*Held:* That the lower court's decision that petitioner's paternity of the legatee was not established was without error.

40. EXECUTORS AND ADMINISTRATORS—*Release by Legatee's Administrators—Interest and Income Due Legatee—Case at Bar.*—In the instant case it was claimed by the surety of an executor that a legatee's representative had the right to a large sum of unpaid but accrued interest or income to be ascertained before settlement could be made of the estate. A paper executed by the legatee's representative released all parties who might be liable for this income or interest, in order that the principal might be distributed. The decree approving that agreement construed it as a release and settlement, so that

neither the executor's estate nor the principal of the testator's estate were bound to pay the interest found due the legatee by the commissioner.

Appeal from a decree of the Circuit Court of Henrico county. Decree for defendants. Petitioners appeal.

*Affirmed.*

The opinion states the case.

*Wellford & Taylor, Garfield, MacGregor & Baldwin* and *Collins Denny, Jr.,* for the appellants.

*R. E. Scott, Thompson, Hine & Flory, P. S. Dudley, J. S. Dudley, Jr., Winthrop & Stimson, James N. Dunlop* and *Frank B. Carpenter,* for the appellees.

CHRISTIAN, J., delivered the opinion of the court.

This is an appeal by the petitioner, Collins Denny, Jr., administrator d. b. n. of the estate of Rhea Gordon Searles, deceased, and Henry Crofut from a final decree entered by the Circuit Court of Henrico county on November 10, 1926, in the consolidated causes therein depending under the short style of *Clifford W. Fuller, Executor, etc.* v. *Myrtle R. Gordon Searles and others,* and *Cannon and De Young, Administrators, etc.* v. *Elsie Gordon Stelle and others,* overruling the exceptions of the petitioners to the report of Commissioner Crawford fixing the rights and liabilities of the parties to these suits, and determining the method of distribution of the assets, and dismissing with costs the petition and amended and supplemental petition filed in said suits by the petitioners.

Practically all the parties primarily interested in the original suit of *Fuller, Executor, etc.* v. *Searles and*

*others* are dead; the suit has been on the docket for twenty years; the record is so large and issues so complicated, that the history of the estate in controversy, the relations of the parties and the proceedings will be necessary to the adjudication of the issues presented by the appellants to this court for decision.

The grandfather of George S. Gordon, whose estate is the subject of this litigation, left a considerable estate in Cleveland, Ohio, and his father having died at an earlier date, his mother and the seven children, including George, inherited this estate. A substantial amount of the estate so inherited consisted of unproductive real estate in Cleveland for which a holding company, known as the W. J. Gordon Realty Company, was formed. Its object and purpose was to sell said real estate and distribute the proceeds among the heirs to whom the stock of said company had been distributed.

On the 3rd day of July, 1902, Clifford W. Fuller, a personal friend of George S. Gordon, and an attorney of large experience was appointed by the Probate Court of Cuyahoga county, in the State of Ohio, in which the city of Cleveland is located, trustee, for the estate of George S. Gordon and by virtue of said appointment a large amount of personal property belonging to George S. Gordon came into possession of the trustee. The trustee properly administered said trust, and settled his accounts therefor periodically under direction of, and by the orders of, said court.

At the time of said appointment of Fuller as trustee, Gordon and his wife Bessie L. were residents of the city of Houston, Texas. His wife instituted divorce proceedings against him in Texas, and claimed the right to $125,000.00 as her share of the community property, for her support and maintenance. Fuller,

trustee, acting under authority given him by the
Ohio court, compromised the property claim at $50,-
000.00; whereof $25,000.00 was to be paid on the first
day of June, 1904, and $25,000.00 on the first day of
June, 1905.

The Texas court granted Bessie L. an absolute
divorce from George S. Gordon and at the same time
entered judgment against him and Fuller, trustee, for
$50,000.00, payable as aforesaid, which became a lien
upon the trust funds of Gordon.   Fuller paid Bessie
L. $30,000.00 and at the date of Gordon's death owed
her about $20,000.00 with interest from the 1st day
of June, 1905.

Shortly after said decree of divorce, Gordon married
Myrtle Hartley, who had previously been married and
had a daughter Rhea, about seven years of age.   This
girl was adopted by Gordon, but not according to the
statute law so as to make her his legal heir.   There
were no children born to Gordon from either of these
marriages.

In 1904 the said Gordon, Myrtle, his wife, and his
step-daughter, Rhea, came to Henrico county, Virginia,
to reside upon a farm called "Brookwood," that Fuller
had purchased as a residence for them for $13,000.00;
payable $5,000.00 cash and the balance $8,000.00 pay-
able at future dates, and secured upon the property.

On the 10th day of January, 1905, the said George S.
Gordon departed this life in Henrico county, Virginia,
after having made his last will and testament, bearing
date on July 22, 1904, which said last will and testa-
ment was duly proved and admitted to record in the
circuit court of said county.   C. W. Fuller the executor
named in said last will and testament qualified in said
court and gave bond in the penalty of $246,000.00 with

the American Surety Company of New York as his surety, conditioned according to law.

The material parts of said last will and testament for consideration are as follows:

"Item III: I give and bequeath unto my mother, Mamie S. Gordon, should she survive me, the sum of fifteen thousand dollars ($15,000.00) the same to be paid by my executor within one year after my decease.

"Item IV: I give and bequeath to my faithful and true friend, Clifford W.. Fuller, of Cleveland, Ohio, the sum of five thousand dollars ($5,000.00) in return for his kindness, honesty and faithfulness to me and mine during my lifetime.

"Item V: I give and bequeath to my executor the sum of one hundred thousand dollars ($100,000.00) to be held by him as trustee for the benefit of my adopted daughter, Rhea G. Gordon, until she shall arrive at the age of twenty-five years; the income from said sum of money to be paid to my said daughter for her support and maintenance in quarterly installments at least, or oftener if in the discretion of my said trustee it seems to be desirable. And I give unto my said trustee full power and authority to invest and reinvest said sum of money during the continuance of this trust. When my said daughter shall have arrived at the age of twenty-five, I direct that said sum be paid over to her for her own use and control. If, however, my said daughter should die before arriving at the age of twenty-five years, without issue, said sum of one hundred thousand dollars ($100,000.00) shall fall into the residue of my estate and be disposed of as said residue is disposed of according to the terms of this will.

"Item VI: I give, devise and bequeath all the rest and residue of my estate of every kind and description

and wheresoever situated, to my executor as trustee
for the benefit of my wife, Myrtle R. Gordon, upon the
following terms: The income therefrom to be paid to
my said wife semi-annually for a term of ten years (10)
after my decease. If at the expiration of said period
of ten years (10) my said wife be then a widow, said
residue of my estate shall be paid over and delivered to
her absolutely."

Fuller, executor, duly filed before the Commissioner
of Accounts of the Circuit Court of Henrico county an
inventory and appraisement of the real estate and
personal effects of George S. Gordon, deceased, amount-
ing to $13,430.00 in Virginia and an appraisement of
his estate that came into possession of Fuller from him-
self as trustee in the city of Cleveland, Ohio, amounting
to $132,438.68—making the aggregate appraised value
of the estate $145,968.68.

Myrtle Gordon, the widow, filed her renunciation of
the will as required by law, thereby electing to take one-
half of her husband's personal estate in lieu of the
provision made for her in his will. She had also inter-
married with James R. Searles. Thus the bequest to
her of the residuum never came into existence.

Whereupon J. Alston Cabell and Henry R. Miller,
attorneys, filed the original chancery suit in the Circuit
Court of Henrico county in behalf of Fuller, as executor
and trustee of the Ohio court, against Myrtle Searles,
the other devisees and legatees under Gordon's will,
and the heirs at law of said testator, wherein was set
forth the character of the estate, the debts against the
same and praying the guidance and direction of the
court in administering and dealing with the same.
David Meade White, a discreet and competent attorney
at law, was appointed guardian *ad litem* for the infant
Rhea Gordon. An order was entered referring the

cause to Commissioner A. H. Sands to take and state
the proper and necessary accounts in the cause.

Commissioner Sands filed his report showing the re-
ceipts and disbursements to September 6, 1907. That
the lien upon the farm had been paid out of the per-
sonal assets, therefore it should be sold and proceeds
treated as personal property. The decree for alimony
due Bessie L. Gordon was declared a lien upon the
trust funds. The final account of Fuller, trustee,
settled in the Ohio court, was accepted as a correct
finding of the assets that passed to Fuller as executor.
The largest part of these assets consisted of 142 shares
of stock in W. J. Gordon Realty Company, valued at
between $50,000.00 and $60,000.00, and interests in
trust funds and estates, subject to the life interest of
his mother and others, valued at $44,000.00. The un-
improved land owned by the Gordon Realty Company
was being sold and the stock if held would yield very
much more than it could possibly be sold for, as Fuller
had received in liquidating dividends $37,000.00 since
Gordon's death, and the stock was still worth its
assessed value. The report further fixed the right of
the widow to one-half of the assets and the balance
to be prorated among the legatees; so that it was
apparent that if the executor proceeded to sell the
estate and distribute the proceeds, the legatees would
not receive much more than fifty cents in the dollar
of their legacies. In this condition the executor deter-
mined not to sell the assets or distribute the stock but
to await the sale of the unimproved Cleveland real
estate and distribution of the proceeds, according to
the purpose and intent of the incorporation of the
Gordon Realty Company. The wisdom of this course
of procedure was demonstrated by the fact that Fuller
received, prior to his death, from the estate of Gordon's

$272,214.22, subject to debts and expenses of $79,-854.36, thus leaving a balance of $192,359.86, which was distributed in part, and should have been distributed between the widow and the legatees.

The Sands' report though duly filed was not confirmed by the court, although a decree confirming the same, endorsed by counsel and the guardian *ad litem,* was filed in the papers in the cause, but never entered of record.

Except a decree adjusting the taxes due the State of Virginia, and an order of sale of the farm "Brookwood," which was duly executed and the proceeds of sale, $16,000.00, deposited in National State and City Bank of Richmond subject to the order of the court, no orders or decrees were entered in the cause. However, Myrtle, the widow, died in 1909 testate, prior to the order of sale of "Brookwood" and the suit was revived against J. W. Searles, her husband and personal representative.

In October, 1917, Fuller died testate and John L. Cannon, his partner, the executor named in his will, duly qualified as such. Shortly after Fuller's death, Cannon attempted to get some order into the affairs of the Gordon estate. Fuller had kept no books nor had he set up the trust fund for Rhea. His receipts of funds were kept in banks to his credit as executor of Gordon, and his disbursements were made by checks upon these funds. All checks and vouchers were found in a suit case in Fuller's office. Cannon immediately realized that Fuller was indebted to the Gordon estate, for which the American Surety Company as his bondsman would be responsible, and by agreement with the Cleveland office of the surety, accountants were called in to ascertain what the assets of the Gordon estate were, and for how much Fuller was liable, over and above the amounts distributed. The accountants, Nau, Rusk

& Swearingen, through their representative, Brubaker, from sources of information available and so far as they could, set down the amounts to which Gordon's estate was entitled and the proper credits which could be given for payments therefrom. Acting under instructions from Fuller's executor and the American Surety Company, the accountants prepared a set of accounts, which were believed to be as nearly accurate as was possible under the circumstances. Rhea Gordon was then alive and her interests were represented by B. I. De Young, an attorney of Philadelphia, whom she had employed to collect her income from Fuller prior to his death. The next of kin at that ime had no interest in the estate, so took no part in the preparation of these accounts.

In October, 1918, Rhea who had previously married Lyle E. Searles, died under twenty-five years of age and without issue, so that the legacy to her of $100,000.00. passed to the next of kin of George S. Gordon. W. W. Sydnor, sheriff of Henrico county, was appointed administrator of Rhea Gordon Searles, and J. L. Cannon and B. I. De Young, were appointed administrators *de bonis non* with the will annexed by the Virginia court of the estate of Gordon.

In the fall of 1919 Cannon and Young, administrators with the will annexed of George S. Gordon, brought suit in the Circuit Court of Henrico county for the purpose of an accounting and to fix the liability of the American Surety Company as surety on the bond of Fuller, executor of Gordon. This suit was consolidated with the original suit of *Fuller, executor v. Searles, et als.*, that had theretofore been revived by an amended and supplemental bill in the name of Cannon, executor. The consolidated cause was then referred by decree to one of the commissioners of the court to take, state and

settle the accounts therein ordered, and fix the liability of the Fuller estate and his surety.

Representatives of the next of kin of Gordon were then notified, and their attorneys, most of whom were from other States, met with the attorneys for the surety company in the city of Richmond to discuss the situation and reach an agreement of settlement. The Brubaker accounts were the basis of the effort of settlement. These accounts allowed Fuller five per cent commissions on the assets that came in his hands, and charged him with simple interest. From said accounts so stated Rhea had been overpaid during her lifetime some $5,700.00 on account of income from the trust fund. The conference broke up without any agreement being reached, and the attorneys from the other States returned to their respective homes to consult with their clients. Sometime in January, 1920, B. R. Wellford, local attorney for the surety company, distributed among the attorneys a draft of account, which threw most of the liability upon the trust account as distinguished from the executor's account, as his client was not surety for Fuller as trustee of Rhea, but only as executor of Gordon, therefore if the misapplication was of Rhea's trust fund there was no liability for same upon the surety company. The Wellford account claimed that Rhea was entitled to interest upon her legacy of $100,000.00 from the end of the year after the date of the qualification of the executor.

Lyle Searles, who had married Rhea, qualified as her administrator in Detroit, Michigan, and through his attorney, W. J. Shaw, of that city, and S. S. P. Patteson of Richmond, Virginia, filed an answer which was prayed to be treated as a cross-bill, wherein he claimed that Rhea was the natural child of Gordon and his wife Myrtle, and that after their marriage had been

legitimized by Gordon's recognition of her as his daughter, and that as her administrator in Michigan, he was entitled to the entire estate bequeathed to Rhea by reason of her death under twenty-five years of age, without issue. Sydnor, the Virginia administrator, appeared by W. W. Beverley as his attorney and joined Lyle Searles in his contentions. R. E. Scott, as resident Virginia attorney, represented the next of kin of Gordon in this litigation. Evidence was taken by both parties, and upon the hearing, the court entered a decree denying the claim of Lyle Searles and finding that Rhea was not the daughter of George Gordon, but this decree did not become final until an appeal was denied by the Supreme Court of Appeals in the fall of 1922.

Immediately afterwards Frank Carpenter, of Cleveland, Ohio, representing several of the next of kin, wrote Mr. Scott with the idea of bringing about a settlement. He entered into negotiations with Mr. Shaw, attorney for Lyle Searles in Detroit, for the purpose of obtaining an assignment and release from Rhea's estate in order to effect a general settlement of the Gordon estate. Mr. Shaw wrote to Mr. Patteson who represented him locally. After some further negotiations and conferences between Messrs. Scott and Patteson an assignment and release was agreed upon in consideration of $2,500.00 paid Lyle Searles, which agreement was executed by Searles in his own right, and as Michigan administrator of Rhea, and by Sydnor, Virginia administrator of Rhea. It was understood among the parties that this compromise agreement was to be approved by the court. A decree affirming the compromise, drafted by Henry W. Miller, and endorsed by the attorneys for all the parties in

interest except Mr. Beverley, was tendered to the court and entered on July 31, 1923.

Commissioner Shields, before whom these causes were pending, having died, they were referred to Commissioner Crawford to take and state the accounts theretofore ordered. Commissioner Crawford heard argument from the numerous attorneys representing the various conflicting claims, and finding the accounts so complicated filed a report with recommendations before the court, and asked for instructions as to the proper method of fixing the liability of Fuller, executor, and his surety; and the rights of the numerous claimants in the distribution of the assets of the Gordon estate. The American Surety Company filed several exceptions to the recommendations of Commissioner Crawford as to the proper method of stating said accounts. Among them was exception No. 7 which claimed that the legatees of Gordon were entitled to interest upon their legacies from the end of one year after Fuller's qualification until paid; not interest only upon the liquidated assets in the hands of the executor from the date the same became available for distribution. The questions presented by the commissioner's report and raised by exceptions were elaborately argued by counsel and many authorities cited. The court took the case under advisement.

While the learned chancellor was considering his opinion to be rendered in the case, Mr. McGregor, Cleveland attorney for the American Surety Company, visited Henry Crofut in Philadelphia where he resided. Crofut had testified upon the issue made by Lyle Searles' cross-bill, that he Crofut, had married Myrtle in 1896, and that Rhea was the offspring of that marriage; that Rhea had come to Philadelphia to reside with him, when she married Searles, and that Searles

had deserted her before her death. The result of this interview was that Henry Crofut qualified as administrator of Rhea in Philadelphia where she died. Shortly thereafter, on motion of Mr. Wellford, Collins Denny, Jr., was appointed administrator of Rhea in Virginia in the place and stead of Sydnor who had died.

Denny, administrator, and Crofut in his own right, and as sole distributee under the laws of Pennsylvania, filed their petition and amended petition in this cause, claiming that Rhea was entitled to interest upon the $100,000.00 legacy from one year after the qualification of Fuller to the time of her death, and that Searles having abandoned, deserted and failed to support her under the laws of Pennsylvania, Searles had forfeited his martial rights in her estate, and that he, Crofut, was entitled to all estate of said Rhea. That the agreement and release of said Searles and Sydnor to the next of kin of Gordon and the decree approving the same were both void, and prayed that the court would so decree.

The court overruled the exceptions to the tentative report of the commissioner and instructed him by decree as to the principles of law whereby the account should be stated. Thereupon Commissioner Crawford stated the various accounts according to his instructions from the court, and filed his report. Denny and Crofut filed exceptions to said report because Rhea was not credited with interest from the date of the death of Gordon, but was only allowed interest upon the liquidated assets when they came into Fuller's possession for distribution.

Upon argument of said exceptions and issues raised by the petition of Denny and Crofut, the court overruled their exceptions, and dismissed their petition, and these rulings of the court are subject of this appeal.

[1–3] The appellants first contention is, that by the

terms of Gordon's will Rhea was given in trust a pecuniary legacy of $100,000.00 which was a paramount charge upon the residuary estate given her mother. This is certainly the correct construction of the will as drafted.    For the provision for his widow is of the residue of his estate, which by its terms means such estate as remains after payment of debts, costs of administration, and payment of all other bequests and devises.    Therefore the general rule of interest on legacies settled in Virginia and elsewhere as follows: "A pecuniary legacy becomes payable one year after the date of the qualification of the personal representative and if not then paid begins to bear interest;" should have been applied to Rhea's legacy, and that the court erred in not charging the estate that reverted to Gordon's next of kin after her death under twenty-five years of age and without issue with interest upon the $100,000.00 legacy from one year after the qualification of Fuller, executor, until her death, subject to credit by such sums as were paid to her by him or his successors.

Numerous cases from various other States and Virginia are cited as authority for the general rule in regard to interest, especially the cases of *Burwell* v. *Anderson*, 3 Leigh (30 Va.) 348, and *Bradford* v. *McConihay*, 15 W. Va. 732.    But the facts in issue in those cases were not similar to the case at bar.

The case of *Burwell* v. *Anderson, supra,* as well as the case of *Granberry* v. *Granberry*, 1 Wash. (1 Va.) 249, 1 Am. Dec. 455, that established the general rule of the time from which fiduciaries should pay interest and legacies bear interest, were both cases where an executor had received money and had failed to pay it out to the distributee, or invest the same or bring the same into court, and the executor was held liable for interest.

The case of *Bradford* v. *McConihay, supra,* and the
other cases like it, were cases where the legacies were
charged upon the particular fund or the entire estate,
and the residue or balance, given or passed to others,
and interest was allowed as compensation for loss of
enjoyment of the legacy.  Examination of the cases.
however, show that interest is not charged under all
circumstances, and that each case must depend upon
its own peculiar circumstances.  Therefore it is neces-
sary to consider the effect of the renunciation of the
widow upon the disposition of the estate by the will
in order to determine the question of the proper al-
lowance of interest to the legatees.

[4, 5] The law conclusively presumes that when the
testator made his will, he knew that his widow by
statute was entitled to one-half of his personal property
after payment of his debts and costs of administration,
and that he could not deprive her of her statutory
estate without her consent.  That if she elected to take
against the will her election ordinarily and almost
necessarily interfers with his scheme for the distribu-
tion of his estate.  He made no provision in his will
to meet this contingency.  "The general rule in such
case is that the election of a widow to take against her
husband's will does not invalidate the will as to de-
vises and bequests to others, except so far as the prop-
erty given thereby may be necessary to satisfy the
claim of the widow under her election, and hence it is
the duty of the court to protect the rights of others
claiming under the will, and to carry out the pro-
visions thereof, if not in the precise mode directed by
the testator, yet in as near that mode as possible."
For cases from most of the States that have adopted
this general rule, see citations in note to *Wakefield* v.
*Wakefield,* Ann. Cas. 1913E, page 417.

[6–8] The legal effect of the widow's renunciation of the will in the instant case in this State was, the gift of the residuary estate to her never came into existence. *American National Bank* v. *Chapin*, 130 Va. 1, 12, 107 S. E. 640, 17 A. L. R. 304, or as stated in other jurisdictions it was "annulled" and "blotted out" of the will, therefore the superior charge of the legacies against the residuary estate was never effective. The legal rights of the parties to the Gordon estate after the widow's election were as follows: The widow was entitled independently of the will to one-half of the estate by virtue of the statute, and the other half thereof was the fund from which the executor must pay legacies provided for in the will. Rhea's legacy was a vested interest, subject, however, to be divested by the contingency of her dying before attaining the age of twenty-five and without issue, in which event the legacy reverted to the next of kin of Gordon. It was manifest from the appraisement and character of the estate that if the executor sold the assets, he would not realize much more than half enough to pay the legacies and the widow.

Under the circumstances surrounding the executor, he did what the law required him to do, brought the assets and the parties before court, in order to carry out the provisions of the will, if not in the precise mode directed by the testator, yet in as near that mode as possible. His primary purpose and duty was to set up a trust fund for Rhea of $100,000.00 or as near that sum as the assets would yield. This was shown by his deposition wherein he recommended that he be permitted to liquidate the assets especially the stock representing the unimproved real estate in Cleveland, Ohio. Commissioner Sands (while not in explicit terms) approved this method of dealing with the estate,

as manifestly for the best interest of all parties entitled.
to the estate.

The widow and legatees being *sui juris*, and Fuller,
trustee, authorized by the will to invest and reinvest the
trust funds, might have agreed to divide the assets.
among themselves according to their respective in-
terest, and in such event the court would not allow
interest to Rhea except upon that part of the fund.
which was income producing.

[9, 10] The appellants contend that the renunciation
of the widow makes no change as to interest upon the
legacy to Rhea, but same is a charge against the next
of kin, by virtue of the rule, where a legacy is given by
immediate bequest, and there is a condition to divest
it upon the death of the legatee under twenty-five (as
in this case) with limitation over, and the legatee dies
before twenty-five, yet, as the legacy under the general
rule in Virginia was payable at the end of the year
after the qualification of the personal representative,
the legatee, and not the legatee over, will be entitled
to the interest which accrues during the legatee's life,
until the happening of the event which was to divest
the legacy.    Bouvier's Law Dictionary (Rawle's Third
Revision), page 1645, citing 1 P. Wms. 501; 5 Ves. 335,
522.

The above rule is subject, however, to the exception,
that where *maintenance* or interest is given by the will,
and the rate specified, the legatee will not, in general,
be entitled to claim more than the *maintenance* or rate
specified.    Bouvier's Law Dictionary, *supra*, citing 3
Atk. 697, 716; 3 Ves. 286, n.    When the gift to Rhea is
construed in the light of the presumption that Gordon
is conclusively presumed to have known the character
of the estate, the intent of the testator by the provision
"the income from said sum of money to be paid to my

said daughter for her support and maintenance in quarterly installments at least," was to limit her claim to maintenance and support to the actual income which accrued upon said sum instead of interest from the end of the year, otherwise Rhea's legacy would have greatly encroached upon residuary legacy, and given her support and maintenance out of the principal of the estate, which is contrary to the language used by the testator.

[11] Where non-income producing assets came into possession of an executor which at the end of the year are plainly insufficient at that time to set up the principal of the trust legacy but in view of experience and sound business judgment will by liquidation yield funds sufficient, or nearly so, to set up the principal, notwithstanding there is a contingency annexed to the gift of the fund to the beneficiary whereby same may be divested, the law and common business sagacity makes it the duty of the executor to manage said assets so that by liquidation and enhancement of value, the principal fund will be realized, even at the loss of the income, especially where the principal and income are given to the same person. The general principle of accounting by the courts is that receipts must be first applied to make up the principal fund, otherwise the interest might encroach upon and in the final result reduce the same.

The method pursued by the executor for realizing the largest fund possible from the assets of the estate was so manifestly for the best interest of the widow and legatees that it cannot be doubted that the court, if asked to do so, would have authorized the executor expressly to liquidate the estate in the manner that he did, and his subsequent derelictions and Rhea's untimely death should not retroactively change the rights of the parties.

[12] Under the circumstances of this case, and in view of the character of the estate and the intent of the testator as gathered from the language of the will, *it is exempt* from the general rule that legacies bear interest after the end of the year from the qualification of the personal representative. The estate in possession of the executor could not be made to produce income until liquidated, the next of kin to whom the legacy passed upon Rhea's death never had the use and possession of same, and the sale of the same by the executor would have sacrificed part of the principal; in this situation of affairs, the executor acted wisely in liquidating the estate, and the court was right in not charging him or the estate with interest except upon the sums which came into his hands for distribution.

### *Second assignment of error.*

The appellants contend that the circuit court erred in dismissing their original and amended petition wherein they claimed that the "release and assignment" of all the right and interest of Rhea in the Gordon estate by Lyle Searles, her husband, in his own right and as Michigan administrator, and Sydnor, Virginia administrator of her estate, because the release and assignment was invalid and void. And that the court particularly erred in refusing to set aside, so far as they are concerned, the decree of July 31, 1923, by which the "release and assignment" of August 2, 1923, was ratified and approved.

This case has been very ably and exhaustively argued on both sides, especially this second assignment of error, and so much authority cited that it is impractical in an opinion to discuss the various points made or briefly analyze the numerous authorities. So

we must content ourselves with pointing out the cardinal facts and the law applicable thereto.

The first claim made by the appellants is that Searles and Sydnor executed the paper without any knowledge of the amount due to Rhea, and that it was the duty of the attorneys for the next of kin to have informed them of their rights, especially the Wellford account and claim.

The facts in regard to the "Wellford account" and its origin are undisptued. Cannon, executor, and the American Surety Company upon the death of Fuller employed the accountants to state the accounts of Fuller as executor and trustee of Gordon under his will. Rhea was living at that time, and De Young, of Philadelphia, her attorney, who had represented her theretofore in collecting her income from Fuller, united in this effort to set up these accounts. On July 31, 1918, the accounts were completed and delivered to Cannon, and were subsequently filed in the record as the "Brubaker account." The above mentioned parties were most largely interested at this time in discovering the assets that came into possession of Fuller, and his disposition thereof. Gordon's next of kin were not consulted nor did they take any part in this accounting.

Rhea died in November, 1918, under twenty-five years of age and without issue, so that the legacy given her by the will reverted to Gordon's next of kin. Sometime in the fall of 1919 the attorneys for the next of kin who were non-residents of this State came to Richmond, where a conference was had with McGregor and Wellford, attorneys for the Surety Company, for the purpose of settlement of the amount due Gordon's estate by Fuller, especially Fuller's liability to Rhea's representative, and the next of kin, for which the surety company was bound by reason of its suretyship

on his bond as executor. The "Brubaker account" was before them. That account showed the receipts and disbursements made by Fuller. It was stated in the manner of mercantile accounts, and showed that Rhea had been overpaid on account of income to the amount of $3,700.00. The attorneys for the surety claimed that its bond only covered and protected Gordon's estate for the receipts and disbursements of Fuller as executor and not as trustee under the will. The "Brubaker account" was accepted as practically correct except in reference to the matter of interest upon Rhea's legacy. It does not appear whether De Young was present at this conference or not, but subsequently he was appointed co-administrator with the will annexed of the Gordon estate. This was done no doubt because he had been Rhea's attorney.

This conference accomplished nothing. After the attorneys returned home, the "Wellford account" was made up, wherein it was shown that Rhea's legacy bore interest on the full amount, $100,000.00, after the end of the year from the qualification of the executor. This account was sent to McGregor, Cleveland attorney for the surety company, who in turn forwarded a copy to the various attorneys representing the next of kin. It does not appear that this account, or the position of the surety company, was called to the attention of Fuller's representative or Rhea's former attorney. Cannon, executor of Fuller, had then filed his amended and supplemental bill which was followed by the original bill of Cannon and De Young, administrators, with the will annexed of Gordon. The purpose of these proceedings was to have the court ascertain the amount and value of the Gordon estate that passed to Fuller under the will, his administration of said estate, the amount due, and to whom, at the time of his death,

and the consequent liability of the surety company upon Fuller's executorial bond. All parties interested in the proper administration and distribution of the Gordon estate were made parties to these proceedings. Rhea's estate was committed to Sydnor, the sheriff of Henrico county. The surety company did not answer and set up its contention before the court. When Lyle Searles, husband of Rhea, and her Michigan administrator filed his answer and cross-bill, asserting his right to the legacy given his wife by the will, and Sydnor, administrator, by Beverley, his attorney, joined therein; no mention was made of the claim for interest as set up by the surety company in the "Wellford account."

After the Searles' claim was decided adversely to him, the attorneys for the next of kin entered into negotiations with Shaw, attorney for Searles, for the release and assignment of Rhea's interest in the estate. Shaw consulted with his associate in Virginia, S. S. P. Patteson, who conferred with R. E. Scott, Virginia attorney for the next of kin. Beverley, attorney for Sydnor, and Miller, one of counsel for Fuller, who filed the original bill, were informed of the negotiations which resulted in the "release and assignment" herein assailed.

It must have been manifest to the attorneys of the ability and standing of those concerned in the negotiations that the only right which Rhea's representative had in the fund was for such interest or income as accrued to her during her life. It could make no difference with the surety company if it was liable for this interest or income to whom it was required to pay the same.

[13] It is urged by the appellants that the rule about interest is different in Virginia from other States, therefore Shaw did not know Rhea's rights when he agreed to the "release and assignment" and that the

Virginia attorneys should have informed him thereof, and further that it should have been brought to the attention of Patteson, Beverley and Miller. This position is incorrect. The rule that a legacy bears interest from the end of the year after the death of the testator is the general rule (subject to exceptions) established by the chancellors of England, and adopted by all of the States so far as we have been able to discover. In Virginia, however, by statute interest begins to run from the end of the year after the qualification of the personal representative.

[14, 15] The question of the application of the general rule of law in regard to interest on Rhea's legacy was a matter of law, and not fact, apparent on the fact of the record, and it was not the legal duty of counsel for the next of kin to inform the opposing counsel of so well established and general rule of law. Withholding material facts to an agreement by a party from the other contracting party, of which he is ignorant, is a suppression which may amount to fraud, but this rule does not apply to matters of law especially where the negotiations were conducted by attorneys of the character, ability and learning of those who managed this transaction.

The feeling engendered by this litigation has been such that we have felt constrained to discuss this phase of the case more at length than perhaps was necessary.

[16, 17] There is another phase of the case that has occasioned some asperity between counsel, which is manifested in their arguments, and the record. That is, that the decree of July 31, 1923, approving and confirming said "release and assignment" was a consent decree, and that Beverley, attorney for Sydnor, did not endorse his request for its entry thereon. Upon its face this decree is not a consent decree, but an

ordinary decree entered by the court with the recital "and was argued by counsel," which at least signifies knowledge of all counsel of its entry, and is unimpeachable except for fraud or perhaps for clear mistake on part of the court. Henry R. Miller, counsel for the administrator, drew the decree; Beverley and Sydnor knew about the contract. The decree recited that all parties in interest desired the court to approve the *release and settlement,* which it did. This decree was asked for by writing on the back thereof signed by counsel for all parties in interest except Beverley, who testifies that he did not know about the decree. At the most, this was a question of mistake of the court which the learned chancellor had a perfect right to deny (without becoming a witness) that such mistake was made, and the recitals of the decree are conclusive.

The next contention of the appellants is that· the next of kin in the litigation with Searles claimed that Rhea was domiciled in Pennsylvania at the time of her death, and that the Michigan court was without jurisdiction to appoint an administrator for her; that Searles had deserted her while domiciled in Pennsylvania more than one year prior to her death, and by virtue of the statute of that State he was barred from his marital rights in her estate.

[18, 19] Judgments of probate courts of the States appointing personal representatives, determining the succession of property, and distributing the assets are in the nature of proceedings *in rem,* and are protected by the "full faith and credit" provision of the Constitution from collateral attack in any other State except upon jurisdictional grounds. "When, however, full faith and credit is demanded for a judgment in the courts of other States, an inquiry into the jurisdiction is always permitted, and if it be shown that the pro-

ceedings relied upon were without the jurisdiction of the court, they need not be respected." *Tilt* v. *Kelsey*, 207 U. S. 43, 28 S. Ct. 1, 52 L. Ed. 95; *In re Horton's Will*, 217 N. Y. 363, 111 N. E. 1066, Ann. Cas. 1918A, 611.

[20, 21] The jurisdiction of the courts of a State to administer the estate and adjudicate its succession depends upon the fact of the domicil of the decedent, except as to real estate. The judgment of the court taking jurisdiction of the estate is conclusive of this fact against every one until successfully impeached in another State, but it is open to the courts of any other State, in the trial of a collateral issue, to determine upon the evidence produced the true domicil of the deceased. In the litigation between Searles and the next of kin, over the title and succession to Rhea's estate, he vouched the judgment of the Michigan court appointing him administrator; he thereby demanded full faith and credit in the Virginia court for that judgment. The next of kin had the right to prove that Rhea's domicil was in Pennsylvania, and that the Michigan court had no jurisdiction to administer her estate or determine its succession. This issue of jurisdiction was made by the pleadings, but the next of kin failed in their proof, and the evidence established that the Michigan court had jurisdiction to make the appointment.

[22] While the Virginia court was not called upon by the parties to explicitly decide this question of jurisdiction, it was raised in the pleadings and evidence offered thereon, and was so essential to its power to determine the issue between the parties that it is conclusive against everyone in this suit. The appellants had no right to put the jurisdiction of the Michigan court in issue again. They were estopped by the recovery to

deny her domicil. However, the chancellor heard that question *de novo*, and from the evidence produced on both trials decided in favor of the Michigan domicil, and we think this plainly right.

[23] The fact that the next of kin denied the jurisdiction of the Michigan court and undertook to prove Rhea's domicil in Pennsylvania in which they failed and subsequently dealt with the Michigan administrator as her proper domiciliary administrator, is not such inconsistent position in this cause as prevents them from denying that Rhea was ever domiciled in Pennsylvania. They have merely admitted that the probate court of Michigan was the proper forum wherein Rhea's estate should be administered.

[24, 25] Having reached the conclusion that Rhea was at the time of her death domiciled in Michigan, the judgment of the court appointing Lyle Searles her administrator gave him, as a general rule, the right to receive and administer her estate according to the laws of that State and under the jurisdiction of its courts. "In respect to the settlement of the successions to property on death the States of the Union are sovereign and may give to their judicial proceedings such conclusive effect as provided by statute, subject to the requirements of due process of law and to any other constitutional limitation which may be applicable." *Tilt* v. *Kelsey, supra.*

[26, 27] In the instant case Rhea's estate was to be administered according to the laws of Michigan, and whether distribution ought to be made by Searles, the domiciliary administrator, or Sydnor, the ancillary administrator, depended upon the circumstances of the case. The law in Virginia is thus stated in the fourth syllabus of *Moses, et al.* v. *Hart's Admr.*, 25 Gratt. (66 Va.) 795: "Where there has been a principal

administration in one State, and an ancillary admin-istration in another, whether the courts of the latter will permit the assets there being to be transferred to the former, *before the legatees as well as the creditors in the State of the ancillary administration* are satisfied, will depend upon the circumstances of each case. There is no inflexible rule on the subject." (Italics supplied.)

[28] It is held in Pennsylvania that legatees and dis-tributees not residing in the State, but seeking their remedies in her courts, were to be regarded as domestic claimants. However, non-residents are not necessary parties to the decision of that question. So that Cro-fut's non-residence does not impair the validity of the decree of July 31, 1923.

[29] If the paper dated August 2, 1923, and called a release and assignment, was a compromise with the Michigan administrator and the decree confirming it, by its language plainly so treats it, then there were no assets of Rhea in Virginia to pass to her ancillary administrator for administration or distribution. This compromise was made *in pais* with Searles a non-resident by the non-resident next of kin, and as Sydnor received nothing and merely joined with Searles *pro forma*, Sydnor in no sense was guilty of a *devastavit*.

[30-33] Whether this compromise or release was valid and binding must be determined by the laws of Michigan and not the laws of Virginia, and the burden was upon the appellants to prove that it was invalid under the laws of that State. The Virginia court was administering the estate of Gordon, resident at the time of his death in this State, and Rhea was a legatee under his will, so that her rights were determined by Virginia statute; however, when she died domiciled in Michigan her estate passed to her administrator to be administered according to its laws. In all jurisdictions.

the first charge against the estate of a decedent are the
debts.  These must be determined by and in the State
of the domicil, except local creditors in other States in
which are assets, and paid before there is, any dis-
tribution.

[34] The general rule of compromises by adminis-
trators is: "An administrator has the right to demand
and receive from an executor or administrator the
share of the estate due to his decedent.  And to this
end he has power to settle and compromise with him,
with a view to the interest of the estate.  It is true that
in such transactions he may lay himself liable to *devas-
tavit*, but if he acts fairly, in good faith, and with a due
regard to the interest of the estate, the distributees will
be bound by his acts, and he will be protected."  *Boyd*
v. *Oglesby*, 23 Gratt. (64 Va.) 674, 685.  The forum of
the domicil must determine his liability.

[35-38] The question presented to the court by the
cross-bill of Searles was whether Rhea was the natural
·daughter of Gordon and had been recognized by him,
so that she became legitimized and was his sole distrib-
utee.  This was a matter of Virginia law determined
by its statutes and its courts were the forum for the
trial of that issue.  Who were the distributees of Rhea
was one of the subjects of determination for the forum
·of her domicil.  It was the duty of Searles, by virtue of
his appointment by the Michigan court, to demand and
·receive Rhea's estate; to ascertain her debts; who were
her distributees, and report to court for its administra-
tion.  This is a proceeding *in rem* and when done is
conclusive upon residents and non-residents unless there
is some reservation of their rights provided by the law
of the forum.

The Circuit Court of Henrico county did not have
the issue of Crofut's paternity of Rhea before it for

decision, and the learned judge of that court in his opinion in the case expressly declares that he did not decide that Crofut was her father, and that his testimony was merely collateral to the issue between Searles and Gordon's next of kin, and had no influence upon the decision of that issue.

[39] His claim to be the father of Rhea is based upon his own uncorroborated evidence given in that case. Myrtle and Rhea were both dead. His relations and neighbors impeached his evidence in that case by testifying that they would not believe him on oath. His account of his marriage to Myrtle and Rhea's paternity does not appear credible. He states that he and Myrtle were, prior to 1896, sweethearts and engaged to be married, which was broken off. That about that time she became pregnant by a man named Gordon and she wrote him requesting him to marry her in order to protect her from disgrace. That he did so and a male child was born of this pregnancy and died in 1897. He and Myrtle lived in various places, and early in 1898 she informed him she was pregnant again. Shortly thereafter they separated, and she divorced him. Rhea was born in that year, and he never saw or knew her until 1916 when she was about eighteen years of age. In that year and until her marriage in 1917 and her death in 1918, she lived at his home and about army camps with him intermittently as his daughter. De Young was his attorney, and he took Rhea to him and he was employed to represent her in securing what was due her by Fuller from the Gordon estate, yet he (Crofut), for nearly seven years, never claimed any interest in Rhea's estate, until suggested to do so by McGregor. Under these circumstances and the evidence the learned judge of the circuit court held that Crofut's paternity of Rhea was not established, and

that he was not one of the distributees, so dismissed the appellants' petition. In this there was no error, conceeding that said court was the proper forum to determine the matter.

[40] The next of kin have not asserted in this record that the paper dated August 2, 1923, was an assignment of Rhea's unascertained right to unpaid interest or income from Fuller or the surety company, with the right to recover same. If they had set up such claim, it would have been essential for them to have alleged and proven (if the circuit court had jurisdiction of the matter) that the laws of Michigan gave him power to make an assignment of her claim, or he was authorized to do so by the court appointing him. It was claimed by the surety company that Rhea's representative had the right to a large sum of unpaid but accrued interest or income to be ascertained before settlement could be made of the Gordon estate. This paper released all parties who might be liable for this income or interest, in order that the principal might be distributed. The decree approving that agreement construed it as a release and settlement, so that neither Fuller's estate nor the principal of Gordon's estate will have to pay the interest found due by Commissioner Crawford. The agreement also by express terms releases the surety company from any claim of Rhea's representative. The release and settlement having enured to the benefit of all parties, and eliminated the question of liability of Fuller and his bondsman for income paid Rhea out of the principal, instead of investing same for income, and the trial court having approved the same as equitable and just between the parties, the decree overruling the exceptions of the appellants and dismissing their petition and amended petition is affirmed.

*Decree affirmed.*