# Staunton

DOMESTIC AND FOREIGN MISSIONARY SOCIETY, &C. V.
CRIPPLED CHILDREN'S HOSPITAL, ET ALS.

September 20, 1934.

Present, Campbell, C. J., and Holt, Epes, Hudgins, Gregory and
Chinn, JJ.

The opinion states the case.

*Williams & Mullen* and *Ralph T. Catterall*, for the appellant.

*Christian & Lamb, Leake & Buford, R. Carter Scott, Jr., Page & Leary* and *John B. Lightfoot, Jr.*, for the appellees.

CHINN, J., delivered the opinion of the court.

Sallie R. Forrest, a childless widow, died August 13, 1928, leaving several testamentary papers, all of which were, on August 24, 1928, admitted to probate by the Chancery Court of the city of Richmond.

The executors subsequently filed their bill in said court, convening all parties in interest, and asking for a construction of the will and instructions as to the proper distribution of the estate.

The testamentary papers in question consist of a formal will, dated February 10, 1928, with a contemporaneous codicil bearing the same date, both duly attested, and two subsequent holograph codicils, both dated May 17, 1928.

Omitting the formal parts, the will and contemporaneous codicil, hereinafter generally referred to as the main will, are as follows:

"First:    I desire all of my just debts to be paid.

"Second:    I desire that in the payment of the legacies hereinafter mentioned in this will these payments shall be made in property belonging to my estate, either real or personal, so far as it is practicable for this to be done. In those cases where it is not practicable for the entire legacy to be paid by the transfer to the legatee of property to the exact value of such legacy, then property of a value as near as possible to the amount of the legacy shall be transferred to the legatee, and any balance paid in cash.   In order to provide the cash funds necessary for the purpose and to make such other payments or disbursements as are required to be paid in money, and in order to effect a distribution of the estate to the various legatees where the amount of the legacy makes it impracticable to deliver property in payment, my Executors hereinafter named are authorized in their discretion to sell such of my property, real or personal, as to them may seem necessary or advisable.   It is my wish and desire, however, that my Executors do not sell any of my property, either real or personal, except as above indicated, but that they shall so far as is practicable, distribute it to the legatees under this will.   In making this distribution my Executors shall use their discretion as to the property to be delivered to each of the legatees, and

their judgment on the subject shall be final and binding upon all concerned. I direct, however, that the valuation put upon my property by the appraisers of my estate shall be the values used as a basis for making distribution to the various legatees. Subject to the foregoing provisions and restrictions, I do give and bequeath the following legacies to the following named institutions and persons.

"Third: I do give and bequeath the sum of ten thousand dollars ($10,000.00) to the Trustees of the Diocesan Missionary Society of Virginia, a corporation chartered under the laws of the State of Virginia.

"Fourth: I do give and bequeath the sum of ten thousand dollars ($10,000.00) to the trustees of the funds of the Protestant Episcopal Church in the Diocese of Virginia, a corporation also chartered under the laws of the State of Virginia.

"Fifth: I do give and bequeath the sum of ten thousand dollars ($10,000.00) to the Domestic and Foreign Missionary Society of the Protestant Episcopal Church in the United States of America, a corporation chartered under the laws of the State of New York.

"Sixth: I do give and bequeath the sum of twenty thousand dollars ($20,000.00) to the Crippled Children's Hospital, now on Brook Road in or near the city of Richmond, Virginia, of which hospital Dr. W. T. Graham is now chief surgeon.

"Seventh: I do give and bequeath the sum of two thousand dollars ($2,000.00) to Robert Munford, Jr., should he survive me, on account of his kindness to my aunt, Miss Mary Sherrard.

"Eighth: I do give and bequeath the sum of ten thousand dollars ($10,000.00) to my sister, Nannie Rutherfoord Fleet, of Ashland, Virginia, should she survive me, and I do give and bequeath to her children or to such of them as survive me each the sum of ten thousand dol-

lars ($10,000.00) namely: Rutherfoord Fleet, Beverly Fleet, Peachy Fleet, Douglas Fleet and Alexander Fleet.

"Ninth: I do give and bequeath the sum of one thousand dollars ($1,000.00) to my colored servant, Mary Jackson, should she survive me.

"Tenth: I do give and bequeath all the rest and residue of my estate to my nephew, Rutherfoord Fleet. I have discussed with my said nephew certain matters which I would like to have carried out in regard to the disposition of this portion of my estate, but this legacy of the rest and residue of my estate is left to him outright, with no restrictions as to what use or disposition he shall make of same.

"Eleventh: The legacies hereinbefore in this will given by me to religious and charitable causes are made by me at the request of my deceased husband, and it is my will and desire that these legacies be invested by the legatees and the income only used for said purposes.

"Twelfth: I nominate and appoint my nephew Rutherfoord Fleet, and the American Trust Company of the city of Richmond, Virginia, as the Executors of this my last will and testament and I do request that they shall be allowed to qualify as such Executors without giving security.

"I do further will and direct that my Executors shall pay out of my estate all estate and inheritance taxes, which may be charged against any legacy left under this will.

"Given under my hand and seal this 10th day of February, 1928.

"SALLIE R. FORREST (Seal)"

"*Codicil*

"In addition to the legacy of $10,000 left to my niece Peachy Fleet I do bequeath to her an additional sum of $10,000.

"Given under my hand this 10th day of Feby., 1928.

"SALLIE R. FORREST"

The afore-mentioned holograph codicils, taken in the order in which they were admitted to probate, and here-inafter referred to as Codicil No. 1 and Codicil No. 2, respectively, read as follows:

*"Codicil No. 1.*

"I Sallie R. Forrest

"To Mr. H. Rozier Dulaney of Washington, or to Mr. James M. Ball, as they may wish, I leave three portraits of Admiral & Mrs. French Forrest and their daughter Mrs. Warley, the two first by the younger West, and three portraits, smaller ones, of Mrs. French Forrest and her two children (Douglas Forrest and his sister) young children, all by the artist Ring.

"I leave also family miniatures to the above named.

"I wish property to be appraised in division and legacies to be given from personal property.

"I give in endowment funds through St. James Church (from my husband Rev'd Douglas F. Forrest & myself)

"$20,000 in endowment fund to Foreign Missions
"$20,000 in endowment fund to Domestic Missions
"$20,000 in endowment fund to Parochial Missions

of the last sum I give $15,000 to Parochial Missions and $5,000 to Hospitals.

"I give legacy of $1,000 to my friend Mrs. Heningham Spilman of Richmond $500 to Mrs. Kate Heflin, her address being Capital Heights, Maryland, and $500 to Frances Bushnell daughter of Mr. & Mrs. Nathan Bushnell now living near Richmond, Va.

"May 17, 1928.

"Written by my own hand, I, Sallie R. Forrest, May 17, 1928."

*"Codicil No. 2.*

"I, Sallie R. Forrest express my wish here as I have before stated, I wish my Real Estate to be appraised, in its bestowal. The legacies to Church organizations may be given from my personal property. The latter legacies in Endowment Fund, I give from my husband the Reverend Doctor Douglas F. Forrest and myself, through St. James Church, of which I am a member.

"These endowment funds I mention are

"$20,000 in Endowment Fund to Foreign Missions
"$20,000 in Endowment Fund to Domestic Missions
"$20,000 in Endowment Fund to Parochial Missions

of the latter I give to Hospitals (Childrens Hospital for Crippled C. Home for Incurables—'The Sheltering Arms' in Richmond.

"My husband left to my charge bestowal of charities for him and myself for my disposition of same.

"I give a legacy of Five Hundred Dollars to Mrs. Heningham Spilman of Richmond.

"Five Hundred Dollars to Mrs. R. E. Heflin, her address being now, Box 32 Capital Heights in Maryland, very near Washington where she served me.

"Five Hundred Dollars to Frances Bushnell, the young daughter of Mr. & Mrs. Nathan Bushnell, Richmond.

"I leave to Mr. R. Rozier Dulaney of Washington to Mr. James M. Ball, Jr., of Richmond, as they may value or desire to possess, according to family relationship, Portraits and miniatures of my husband's family. The Portraits, which they may select or choose are of Admiral and Mrs. French Forrest by West (the younger) and of their daughter Mrs. Warley. These are paintings of larger size. There are three Portraits of smaller size by Artist Ring. They are of Mrs. French Forrest, mother

of Douglas F. Forrest and her two young children Douglas F. Forrest and his sister (later Mrs. Warley).

"SALLIE R. FORREST written by
my own hand this day of May 17, 1928."

The provisions of the main will being plain, the meaning and intent of the two holograph codicils of May 17, 1928, give rise to the only questions presented for determination.

It was held by the lower court that the general pecuniary legacies bequeathed by the main will and contemporaneous codicil, amounting to $123,000, should first 'be paid in full out of the corpus of the estate, with interest from the 24th day of August, 1929, until paid. It was then held that the bequests made in the holograph codicils were intended by the testatrix to be paid only out of the residuum of her estate, after the payment and satisfaction in full of the legacies bequeathed by the main will and the codicil of even date therewith; that the bequest of "$20,000 in Endowment Fund to Foreign Missions," and the bequest of "$20,000 in Endowment Fund to Domestic Missions" were intended as cumulative legacies to be paid out of the residuum of the estate; and that the Domestic and Foreign Missionary Society of the Protestant Episcopal Church in the United States of America should take the $20,000 given in said codicils to Foreign Missions, and the Trustees of the Diocesan Missionary Society in Virginia should take the $20,000 given in the codicils to Domestic Missions; that $15,000 of the $20,000 given in the said codicils to Parochial Missions lapsed for the reason that there is no such organization to take said fund; and that the remaining $5,000 of said bequest should be divided equally between the Crippled Children's Hospital, Sheltering Arms Hospital and Home for Incurables, in the city of Richmond. It was further held that from the residuary estate there should also be paid

to Mrs. Spilman $1,000, to Mrs. Heflin $500, and to Frances Bushnell $500, and the balance, if any, to Rutherfoord Fleet.

It is first contended by the appellant that although the charitable bequests mentioned in the holograph codicils were intended to be cumulative, the court erred in holding that they should be paid out of the residuum only; claiming that these bequests are of equal dignity with those in the main will.

Rutherfoord Fleet, as residuary legatee, contends, on the other hand, that the bequests above referred to are not dispositive in character or effect, or, at the best, are only substitutional. The answer to these contentions depends, of course, upon the intention of the testatrix as found in the language of the testamentary papers themselves, read in the light of the facts and circumstances surrounding the testatrix at the time she executed them.

As said in *Penick's Executor* v. *Walker,* 125 Va. 274, 99 S. E. 559, 560: "The primary consideration and rule of construction is to determine the intention of the testator *from the language which he has used.* If the meaning of that language is plain, the rule must be given effect accordingly. This rule is familiar and elementary, and to it all others are subordinate and subservient. If there be doubt as to the meaning, then the auxiliary or subordinate rule to be applied, and the one of most usefulness and importance, is for the court to place itself as nearly as possible in the situation of the testator at the time of the execution of the will." (Italics supplied.)

In the case of *Coffman* v. *Coffman,* 131 Va. 456, 109 S. E. 454, 457, the court quotes extensively from Prof. Graves' article on "Extrinsic Evidence," wherein the distinguished author, in discussing when "the facts and circumstances" are admissible in cases of disputed interpretations, says: "For the object of interpretation is to ascertain the meaning of the words as used by the testator, what the words represented in his mind; what he understood to be signi-

fied by them; and for this purpose it is indispensable that the expositor should know the situation of the testator; the state of his family and property; his relation to persons and things; his opinions and beliefs; his hopes and fears; his habit of thought and of language; in a word, that the interpreter should identify himself with the testator as to knowledge, feeling and speech, and thus scanning the words of the will from the testator's point of view, decides as to their meaning as used by him.

It may be observed, first, that Mrs. Forrest had certain marked characteristics which seem to have been well summarized from the evidence by the learned judge of the lower court as follows:

"She was determined to do things in her own way, even to almost stubbornness; far from being amenable to any suggestion or advice; never content with one statement, but insisting on repeating the same idea over and over again; withal, accurate, precise, sensible, hard headed, but at the same time generous in her own way and after her own fashion to relatives and charity, and above all scrupulous to carry out the desires of her husband as expressed in his will and to her privately."

At the time the main will and codicil were executed Mrs. Forrest was ill in St. Luke's Hospital in the city of Richmond. Her nephew, Mr. Rutherfoord Fleet, heard of her illness and went to see her, when she informed him that she had made a will in June, 1927, which was then in the custody of the American National Bank and Trust Company, but it did not suit her and she wanted to write a new will. At her request Mr. Fleet obtained a copy of the will from the bank, and noted on the margin thereof the changes which Mrs. Forrest wanted to make in the new will, which was executed as hereinbefore mentioned.

It will be observed that in the tenth clause of her main will, after giving the rest and residue of her estate to her nephew, Rutherfoord Fleet, testatrix used this language:

*"I have discussed with my said nephew certain matters which I would like to have carried out in regard to the disposition of this portion of my estate,* but this legacy of the rest and residue of my estate is left to him outright, with no restrictions as to what use or disposition he shall make of same."

It may here be noted that in the old will of 1927, hereinbefore referred to, after providing for certain charities and other legacies, the testatrix had made her sister, Mrs. Nannie R. Fleet, and her five children, one of whom is Mr. Rutherfoord Fleet, the residuary legatees of her estate in equal shares. Mr. Fleet testified that an important reason for leaving the residue to him in the will of February 10, 1928, was to make sure that certain of Mrs. Forrest's relatives did not get possession of her private papers.

It was testified by Mr. Fleet that the testatrix told him at the time the will of February 10, 1928, was prepared that she wanted him "to make certain gifts out of the residue of the estate;" that "after the will had been signed she at various times mentioned gifts that she wanted me to make out of the residue. She mentioned she wanted me to give $500 to Mrs. Spilman, and on another occasion she told me she wished $500 given to Mrs. Heflin, and on still another occasion she stated she wished $500 given to little Frances Bushnell. Then on another occasion she referred to the portraits of Dr. Forrest's family," etc., etc.

All of this occurred prior to the date of the holograph codicils, May 17, 1928.

It was further testified by Mr. Fleet that Mrs. Forrest handed him the paper herein designated as Codicil No. 2, dated May 17, 1928, under the following circumstances: "I went in the Chesterfield to see Mrs. Forrest one afternoon and she handed me the paper with the statement that it was a memorandum with regard to her will and covering matters that she had already discussed with me

*in regard to the residue of the estate."* Mr. Fleet says this occurred May 31, 1928. Later on he was asked this question:

"Q. What was her remark when she handed you the paper as near as you can recollect, to put in the record?

"A. Her remark was, that it was a memorandum in regard to her will and covering matters that she had talked to me about.

Mr. Scott, guardian *ad litem,* asked Mr. Fleet the following questions:

"Q. I understand that, after the will, prepared by Mr. Gordon, was executed, Mrs. Forrest made certain statements to you, that she wished out of the residuum, certain bequests to be paid to Frances Bushnell and Mrs. Spilman and one other person?

"A. Yes.

"Q. Was that before May 17, 1928?

"A. Yes, sir. I may add to what I have said in answer to Mr. Scott's question that, at the time the will was drawn, Mrs. Forrest told me that she would have some bequests she wanted me to pay out of the residue."

The evidence shows that at the time of the execution of the holograph codicils under consideration Mrs. Forrest was living at the Chesterfield Apartments in the city of Richmond. As already stated, on May 31, 1928, Mrs. Forrest delivered the paper designated as Codicil No. 2 to Mr. Fleet. After her death the paper designated as Codicil No. 1 was found in the drawer of her dresser in her apartment, folded with a copy of her main will. As far as the record discloses, Mrs. Forrest was entirely satisfied with her will of February 10, 1928, except that on one occasion before the date of the codicils she told Mr. Fleet that the will omitted to state that St. James Church was to get credit for the religious gifts, and on another occasion she told Mr. Fleet that she understood money had been spent very lavishly for the Crippled Children's Hospital and that they apparently had more money than

they knew what to do with, and she wanted to have her will altered so as to change the legacy which was being left to the Crippled Children's Hospital. Mr. Fleet told testatrix that he would see to it that St. James Church would get credit for the religious gifts, and also told her he was satisfied that she had been misinformed in regard to the Crippled Children's Hospital, and used his best efforts to persuade her not to make any change in the legacy.

As has already been observed, in item ten of her main will, Mrs. Forrest gave her *residuary* estate to Mr. Fleet without any legal limitations or restrictions, entrusting him to carry out such oral directions as she might give him during her lifetime with respect thereto. The evidence shows that pursuant to this provision of her will, Mrs. Forrest discussed with Mr. Fleet on numerous occasions how she desired him to dispose of a part of her *residuary* estate, and some of the directions which she had given him were subsequently reiterated. Later, and in entire accord with her disclosed characteristics to have things done in her own precise way rather than hazard the uncertainties of memory, and in order to satisfy her own mind that her instructions would be left in a definite form, on May 17, 1928, she reduced to writing her final wishes as to how she desired her residuary estate to be disposed of.

Reading the language of the two codicils in the light of the surrounding facts and circumstances at the time they were executed, and in connection with the main will, we think it clear that the testatrix intended the charitable legacies mentioned in the holograph codicils to be dispositions of a part of her estate. The language itself used in the codicils, reading them both together, clearly indicates this. In one she uses this language: "I *give in endowment funds* through St. James church (from my husband, Rev'd Douglas F. Forrest and myself)." In the other codicil she says: "The legacies to church or-

ganizations may be given from my personal property. *The latter legacies in endowment fund I give* from my husband the Reverend Doctor Douglas F. Forrest and myself through St. James church of which I am a member. *These endowment funds I mention are,"* etc.

We rarely find in the holographic will of a layman more specific testamentary language than that above quoted. Certainly it is sufficient to show a dispositive intent.

It further appears from the record that Mrs. Forrest was a devout member of the Episcopal Church and not only venerated her husband's memory and had the most intense desire to carry out his wishes, but she was evidently also proud of his prominence and high standing in the church as a clergyman. In the eleventh clause of her main will she had merely stated that the legacies therein given by her to religious and charitable causes were given at the request of her deceased husband. It was testified by Mr. Fleet that she told him she had given in her main will to such causes the amount she had received from her husband's estate. Considering these facts, it seems to us manifest that when Mrs. Forrest decided to reduce to writing her final wishes in regard to the disposition of her residuary estate instead of leaving it to Mr. Fleet to carry out such verbal directions as she had given, or might give him in regard thereto, she not only wanted the codicils to show that St. James church was to receive credit for her charitable gifts, but also wished to give an additional sum to the religious causes therein designated out of her own estate from both her husband and herself. It, therefore, seems plain that Mrs. Forrest intended by the codicils to reduce everything to writing and therein dispose of the residuum which she had previously left to Mr. Fleet by the tenth item of her main will. It is likewise manifest from the extrinsic evidence and the codicils that the codicils were intended to dispose of her residuary estate only, and have no refer-

ence to the legacies bequeathed in the main will. Such being the case, it necessarily follows that the legacies bequeathed by the codicils are intended to be cumulative and in addition to the legacies bequeathed by the main will.

It is argued by counsel for Mr. Fleet that the reference to the charitable legacies in the holograph codicils are mere restatements by the testatrix of what she had already given to religious organizations in her main will. It is to be noted that in the main will the amounts given to the various religious organizations varied considerably from those mentioned in the holograph codicils; that in the main will no gifts are made in *endowment funds,* no particular gifts made to Domestic Missions or to Foreign Missions and no gift whatsoever to Parochial Missions. To hold, therefore, that the religious bequests are mere restatements of those made by the testatrix in the main will, and, for that reason, not intended to be dispositive in character, would, it seems to us, be in violation of the intention of the testatrix as denoted in the express language used in her testamentary papers when read together. There is nothing in the words used by the testatrix or in the evidence tending to sustain this contention.

It is also argued that the charitable bequests referred to were intended to be substitutional because it is not reasonable to suppose that Mrs. Forrest would have disposed of a larger sum than her residuary estate would amount to, or that she would, in any event, have given such a large part of her estate to the charitable objects therein mentioned.

While it is true that the evidence tends to show that the total value of Mrs. Forrest's estate was less than the aggregate amount of the specific legacies bequeathed in the main will and the legacies given in the codicils, if the latter are held to be cumulative, we do not think the fact that her residuary estate may prove to be insufficient to pay the legacies given out of it in full, is sufficient

to defeat her intention as gathered from the testamentary language used and the surrounding circumstances. It frequently happens that a testator devises or bequeaths more than he actually has. Such circumstances cannot be allowed to set at naught the manifest wishes and intent of the testator. Nor do we think that the size of the legacies given to church organizations and other charities is sufficient to show that the bequests given in the codicils were intended to be substitutional rather than cumulative. It appears from the evidence that the appraised value of Mrs. Forrest's estate at the time of her death approximated $163,000, though the evidence also shows that the actual value of the estate was approximately $178,000. Out of her total estate Mrs. Forrest gave, by her main will, $73,000 to her sister, Mrs. Fleet, and her nephews, niece and friends, and $50,000 to church organizations and other charities, being the value of the estate which Mr. Fleet says she told him she had received from her husband under his will. As has already been stated, Mrs. Forrest was deeply religious, devoted to her church and to her husband's memory. These were the paramount subjects of her thoughts. They represented her closest and most sacred ties. In her mind all else was secondary and subordinate. Having no descendants, and having by her main will given over fifty per cent of her own estate to her collateral relatives, it does not seem an unnatural or unreasonable desire on her part to give the greater part of the residue as an endowment fund to the religious and charitable organizations of her church, in the name of her deceased husband and herself.

Mr. Fleet's counsel further argue that these charitable bequests were intended to be substitutional because it would be unnatural to assume that Mrs. Forrest desired to increase the gift to the Crippled Children's Hospital, as provided in the codicils, after she had expressed her concern to Mr. Fleet in regard to the reputed extravagance on the part of that institution. Entering the field

of conjecture, we may say it is possible that Mrs. Forrest intended the gift of $20,000 to "Parochial Missions" and the hospitals therein mentioned to take the place of the bequest to the Crippled Children's Hospital in her main will. Such a supposition cannot, however, be given effect for the reason that there is nothing in the language used to indicate such an intention, and also for the reason that the evidence plainly shows the dispositions in the codicils were intended to apply to the residuum only.

It is finally argued in behalf of Mr. Fleet, the residuary legatee under the main will, that the meaning and intent of the holograph codicils is too uncertain to be effective. Having, for the reasons stated, reached the conclusion that the bequests to religious organizations in the holograph codicils were intended to be dispositive and not mere restatements of what was contained in the main will, and that the said bequests were intended to be cumulative and not substitutional, the above question has necessarily been already determined. The mere fact that the true meaning and intent of the codicils is a debatable question, the solution of which presents difficulties, does not warrant the court in declaring the controverted bequests void for uncertainty, thus defeating them altogether, if it is possible to arrive at any reasonable construction which will give validity to the bequests and carry out the wishes of the testatrix with respect thereto.

"In the construction of wills the object is not to seek flaws and declare them invalid, but to sustain them if legally possible, and the presumption is that the testator intended a lawful rather than an unlawful thing. Therefore, where the language used in the will is reasonably susceptible of two different constructions, one of which will defeat, and the other sustain the provisions, the doubt is to be resolved in favor of the construction which will give effect to the will, rather than the one which will defeat it. That construction is to be adopted which will sustain and uphold the will in all its parts, if it can be

done consistently with the established rules of law. * * * It is also a general rule that all parts of the will are to be construed in relation to each other so as to, if possible, form one consistent whole. So the words in each paragraph of the will should be given such force and effect as to harmonize the whole instrument and permit all parts to stand together." 28 R. C. L., pp. 206-207.

In the case of *Wootton* v. *Redd's Ex'rs*, 12 Gratt (53 Va.) 196, 205, the court said: "But however great may be the doubt and obscurity which rest upon the subject, and however difficult may be the task of eviscerating the intention of the testator, still if it can be ascertained by any legitimate means, it must be held sacred, and full effect must be given to it."

Coming back to the appellant's assignments of error, it is contended in its petition that the legacies left by the holograph codicils are entitled to the same treatment—in other words, to stand on a parity in the distribution of the estate with the legacies left in the main will. This position is inconsistent with that of the appellant in which it claims that the holograph codicils were intended to deal entirely with the residuum of the estate, as it necessarily follows, if that be true, that such legacies are not to be paid except out of the residuum after the payment in full of the legacies provided for in the main will, and until these legacies are paid there can be no residuum. We are, therefore, unable to see any merit in this contention.

It is next contended by appellant that no interest should be allowed on the legacies left in the main will, as provided in the decree of the lower court, unless all legacies are placed on a parity and the interest thereon pro-rated.

In the case of *Armentrout* v. *Armentrout's Executors*, 112 Va. 660, 72 S. E. 721, it is held: "When legacies are payable by the executors out of the estate of the decedent in his hands to be administered, the general rule is that

they are payable at the end of the year from the death of the testator, with interest from that date, unless some other time is fixed by the will when interest is to begin."

And in *Denny* v. *Searles,* 150 Va. 701, 143 S. E. 484, 493, where it was argued that the rule about interest is different in Virginia from other States, this court said: "This position is incorrect. The rule that a legacy bears interest from the end of the year after the death of the testator is a general rule (subject to exceptions) established by the Chancellors of England and adopted by all the States so far as we have been able to discover. In Virginia, however, by statute, interest begins to run from the end of the year after the qualification of the personal representative."

And this is true although the fund out of which the legacy is payable is wholly unproductive, or where the delay in the payment of the legacy, due to the fact that the validity of the will was in litigation, or the legatee himself interposed obstacles, or assets sufficient were not then available. Schouler on Wills, Executors and Administrators, vol. 4, p. 225; 40 Cyc., pp. 2103-2104.

Appellant claims that the court erred in holding in said decree that the Trustees of the Diocesan Missionary Society in Virginia, a corporation, is a legatee of the $20,000 referred to in the holograph codicils as "$20,000 in Endowment Fund to Domestic Missions."

It appears from the evidence that the Domestic and Foreign Missionary Society of the Protestant Episcopal Church in the United States of America is a corporation, and is the sole fiscal agency through which all the Foreign and Domestic Missionary work of the Episcopal Church in the United States is conducted; that among the members of the Episcopal Church the term "Foreign Missions" means the missions of the church conducted by the Foreign and Domestic Missionary Society outside of the United States, and the term "Domestic Missions" means the missions of the church conducted by said so-

ciety in the United States and its territories; and that "Diocesan Missions" has an altogether different meaning from "Domestic Missions" and refers to the work in a single Diocese of the Church as opposed to the work in the country as a whole. That portion of the decree now under consideration is evidently based upon the evidence given by Dr. Brydon that the words "Domestic Missions" is sometimes used loosely by members of the church so as to include "Diocesan Missions." While it may be true that in using the words "$20,000 in Endowment Fund to Domestic Missions" the testatrix really meant to refer to "Diocesan Missions," we think that such a construction would be too conjectural to be given effect. According to the evidence, the Domestic and Foreign Missionary Society is the only organization authorized to receive and disburse money for Domestic Missions. We are, therefore, of the opinion that under the evidence and rules of law on the subject, the appellant, the Domestic and Foreign Missionary Society, should take the $20,000 endowment fund given by the codicils to "Domestic Missions" as well as the $20,000 given by said codicils to "Foreign Missions," and that the decree of the lower court should be amended in this respect.

Finally it is contended by the appellant that the legacies given to it by the holograph codicils should be paid out of the personal estate.

It appears that according to the appraisal of the estate it included about $40,000 worth of real estate in the cities of Baltimore and Washington, practically all of which was situated in the District of Columbia. The court had previously instructed the executors to sell this real estate, and the decree appealed from directs them to hold the proceeds subject to the further order of the court. The same decree directs the executors to distribute the rest of the estate forthwith. The complaint is, that if that portion of the decree is carried out, all of the Virginia assets will be distributed to the legatees

named in the main will, and only the proceeds of the foregoing real estate will be left for the legatees named in the codicils. It is stated in the petition that unattested holographic testamentary writings are invalid under the laws of the District of Columbia, and the question would then arise as to whether the proceeds of the Washington real estate would be governed by the laws of the District of Columbia. It is conceded in the petition that this question is not open on this appeal because it was not adjudicated below, but it is assigned as error that the chancellor ought not to have ordered the estate to be distributed in such a way as to raise that question, especially because it is provided by the codicils that the legacies to church organizations may be paid from personal property. It is also claimed that the doctrine of the marshalling of assets compels the application of the proceeds of the foreign real estate first to the payment of the legacies given by the main will.

Without expressing any opinion on the question of whether the proceeds of the Washington real estate would be governed by the laws of the District of Columbia, since it appears that the real estate mentioned has been sold and the proceeds of the same are now being held subject to the order of the court in this cause, we think it would better subserve the interests of justice to first pay the legacies bequeathed by the main will, so far as the same will go, out of the proceeds of the foreign real estate mentioned, in order that the legacies bequeathed by the codicils may be paid out of whatever residue of the personal estate shall remain after the satisfaction in full of the legacies bequeathed by the main will, with interest as aforesaid, as provided by the decree, and the payment of all estate and inheritance taxes which may be charged against any of the said legacies, as provided by the twelfth clause of the main will.

For the foregoing reasons, we are of opinion that, subject to the exceptions hereinbefore noted, the decree com-

plained of should be affirmed in all respects, and so far as said exceptions are concerned the cause should be remanded to the court below to be therein proceeded with according to the views expressed in this opinion.

*Amended and affirmed.*

EPES and HUDGINS, JJ., dissenting.