## CIRCUIT COURT OF ROCKBRIDGE COUNTY

Richard Tanson

v.

Dominica Radulescu

July 1, 1994

BY JUDGE GEORGE E. HONTS, III

On June 3, 1994, this Court, sitting in Fincastle, Virginia, heard arguments on motions by the complainant, Richard Tanson (1) to deny Edward Chrzascik's (Edward) motion to intervene in this proceeding and (2) to preclude Dominica Radulescu (Dominica) from assertion of non-paternity.

This cause comes on an appeal from the order of the Juvenile and Domestic Relations Court of Rockbridge County granting joint custody of the child, Alexander, to Tanson and Dominica. Subsequently, a divorce action has been filed between Tanson and Dominica which is also pending in this Court.

Tanson and Dominica were married some years ago in Chicago, Illinois. Dominica had fled Romania for Italy and eventually gained entry into the United States where she completed her advanced education, which had been begun in Romania. Tanson, because of treatment for a serious illness, was unable to complete his advanced degrees. The treatment of that illness also left him sterile. Tanson and Dominica met, courted, and married. Dominica knew at the time of the marriage that Tanson was sterile.

Something over five years ago, Dominica had a liaison with Edward. Whether the relationship was an adulterous affair in the classic sense of that term or an effort on her part to become pregnant is a matter of further proof. In either event, Dominica became pregnant. Edward did not know at the time he was the father of the child. Tanson, for obvious reasons, was upset by the pregnancy but through counselling and reflection came to accept the fact and, when the child, Alexander, was born, came to accept

the child. In oral argument, it was conceded that Tanson and the child have bonded.[1]

At or about the time Dominica was offered a position as a teacher of the French language at Washington and Lee University, she became pregnant again, this time by someone other than Edward. Tanson, apparently reluctantly, followed his wife to Virginia. Tanson found employment at the University of Virginia, and the parties separated. The custody petition and the divorce action ensued. We address these issues in the context of the appeal of the custody determination made in the Rockbridge County Juvenile and Domestic Relations Court. Dominica first asserted nonpaternity in the Juvenile Court action in Rockbridge County.

When Edward became fully aware he was the father of the child is subject to further proof. In any event, he clearly learned he was the father when he was ordered by the Juvenile and Domestic Relations Court of Rockbridge County to submit to DNA testing, the results of which established with 98.8 percent certainty he is, in fact, Alexander's father. Upon learning of his paternity, he petitioned to intervene in the custody action, and his intervention was denied by the second judge in the case. (The case began under Judge Robert Culpepper, who resigned, and was replaced by Judge Curry.)

Alexander has not been told who his natural father is. He has some limited contact with Edward and will have further contact this summer in Chicago. Extended summer vacations between Tanson and the child are the subject of an agreed order.

While the case is before this Court *de novo*, certain facts and actions taken prior to the appeal cannot be ignored. (A) The blood tests ordered by the Juvenile and Domestic Relations Court have established, as the matter now stands, paternity in Edward.[2] Edward knows that fact. (B) While Tanson may have been reluctant to leave Illinois for Virginia, he was not forced to do so. (C) Alexander is a human being, not a chattel.[3]

---

[1] We use this shop-worn phrase to mean that Tanson and Alexander developed a close father-son relationship.

[2] We stand unadvised of the judge's reason for ordering the blood test or the other judge's reason, when faced with the results of that test, for precluding Edward's intervention.

[3] I do not find custody of a child to be a property right. The benefits inuring to and from such a relationship are intangible.

Much of what must be decided subsequent to these motions hangs on whether or not Edward is allowed to intervene in this proceeding. Counsel for Tanson raise three reasons why he should not be allowed to intervene: (1) He is barred by the Illinois statute of limitations; (2) He is equitably estopped from raising the issues anticipated; and (3) It is in the best interest of the child that he not be allowed to intervene. We shall address these issues in the order presented.

(1) We recognize our obligation and duty to give full faith and credit to the laws of other jurisdictions. Were Alexander a chattel rather than a human being, it might well be that Illinois law and its particular provisions regarding limitations on actions to establish paternity would control. We have, however, recognized that ours is a mobile society by establishing the uniform child support and uniform child custody laws. In reviewing the jurisdictional provisions of Section 126, Chapter 8, Title 20, of the 1950 Code of Virginia, as amended, Alexander meets every criteria for the exercise of jurisdiction by the courts of this Commonwealth. That jurisdictional fact does not beg the question of whether the law of the forum or the law of the state of birth should apply.

Mr. Tweel very articulately raises a "what if" point in his reply brief, that being, if the parties still resided in Illinois, then Illinois law would apply, the two-year statute of limitations would apply, and Edward would be out of court.

The fact remains that Edward's paternity was not established by blood tests until the child had been in Virginia for approximately two years. The child was three when Tanson and Dominica left Illinois, but their departure was for legitimate purposes and not to evade the Illinois statute. Again, were Alexander a chattel rather than a child, substantive rights under the Illinois statutes would probably attach and govern his disposition irrespective of the reasons Tanson and Dominica left Illinois, but he is not a chattel.

Once the child became domiciled in Virginia, this Commonwealth acquires a compelling interest in his well-being and his best interests. To apply the Illinois statute in a vacuum would not necessarily equate with the child's best interest or with the Commonwealth's legitimate concern for his interests.

Because of the mobility of our society, we pose an additional "what if" question. What if Alexander was conceived and delivered in, say, the State of Michigan but had resided in the State of Illinois after his discharge from the Michigan hospital and then moved to Virginia. And "what if" Michi-

gan, Illinois, and Virginia each had a different statute regarding the right to establish paternity, custody, and other related matters. Do we then apply the law of Michigan, Illinois, or Virginia? It appears to me that to apply a statute of limitations of a foreign jurisdiction to such a scenario is neither in the best interest of the child, nor does it serve the public policy concerns of this Commonwealth. Such argument would not apply, of course, to questions such as the validity of a marriage, property rights in a will contest, or other property matters. Nor would such an argument be valid in the context of a decree of a competent Illinois court in this case; but no Illinois court ever addressed the issue of Alexander's paternity.

It is because we are dealing with relationships with a child and not property rights that cases such as *Denny v. Searles*, 150 Va. 701 (1928), are not particularly helpful in determining the issue at hand.

I find the Illinois statute of limitations does not apply.

(2) The issue of Edward's being equitably estopped from raising the issues anticipated is the second issue we address.

In the limited evidence and representations now before the Court, we find Edward had reason to *suspect* he might be Alexander's father. That assumes a union between Dominica and Edward which has not been denied. What is not before us is whether Edward knew or should have known Tanson was sterile.

If he did not know Tanson was sterile, then there are moral and practical reasons for his not asserting paternity earlier. The wife's lover, confronting her husband with his paternity of a child, is not something either practical or pleasant to contemplate. Such an allegation, absent particular known circumstances, would be potentially devastating to all concerned. We only know at this point that Edward's suspicions were enhanced by and confirmed by a *court ordered* blood test. Confronted with the results of that test, Edward came forward to assert his claims in this proceeding.

> As estoppels prevent the actual truth, they are tolerated in a few cases only from absolute necessity. Therefore, the doctrine of estoppel should be applied cautiously and only when equity clearly requires it to be done. Moreover, the doctrine of estoppel once tortured into a variety of absurd refinements, has, in great measure, been reduced to consonancy with common sense and justice.

7A M.J., *Estoppel*, Sec. 2.

> An estoppel has been said to be that which prevents one from showing the truth, it is that which shuts out the evidence of the actual truth in the case.

*Id.*

As between Tanson and Edward, Tanson's plea for equitable estoppel must fail based upon the limited facts before us. Here equity does not clearly require the application of the doctrine. To prevent the truth in this cause as between them is to torture the doctrine into an absurd refinement.

> The general rule of equitable estoppel . . . estoppel in pais, is that when one person, by his statements, conduct, action, behavior, concealment, or even silence, has induced another who has a right to rely upon those statements, or the like, and who does rely upon them in good faith to believe in the existence of the state of facts with which they are compatible and act upon that belief, the former will not be allowed to assert, as against the latter, the existence of a different state of facts from that indicated by his statements or conduct, *if the latter had so far changed his position that he would be injured thereby.*

7A M.J., *Estoppel*, Sec. 14 (emphasis added); *also see T. v. T.*, 216 Va. 807 (1976).

Dominica encouraged the relationship between Tanson and Alexander. Her statements, conduct, actions, and behavior fostered a father-son relationship between the two. Tanson relied upon her position and representations and became a father to this child. Dominica must be estopped from now changing her position.

And, because of that estoppel, Dominica must now be barred from asserting non-paternity in this cause.

(3) That leaves us with the question of what is in the best interest of the child. We are torn between two very valid points asserted as to what is in the best interest of this child. Certainly, a strong argument can be and has been made that the child should know who his biological father is. Equally certain is the fact that Tanson and Alexander have a father and son relationship.

While we have heard evidence that Alexander can enjoy "two fathers," that argument is not persuasive. What is troubling is that everyone who has an interest in Alexander knows the true facts of the situation, but Alexander does not. The result of the revelation of the true facts to the

child are not, and cannot, be known. The child may either be traumatized by the revelation or because of his tender years be unable to comprehend the ramifications of the revelation.

Alexander now recognizes Tanson as his father. Tanson has recognized Alexander as his son in all contexts except biological. We must assume Dominica conceived and bore Alexander out of a true desire for motherhood, and if that assumption is correct, she is not to be faulted for her conduct on a human and humane level. But, having done so, she must also accept the consequences of her acts, including the fact she kept the true paternity secret from the biological father and encouraged the development of strong paternal feelings in Tanson.

To disrupt the world as Alexander now understands it will be to his detriment. The law requires Dominica, Tanson, and Edward put aside their personal urges and desires in order to accommodate the best interests of this child. We are not unmindful of the wishes of the various adult parties; but we must remain focused upon the best interests of the child. The best interest of this child is to not disturb the status quo as he perceives it. The division of this child is not Solomonic.

Dominica and Tanson have held this child out to all comers as their child. Although the stigma has lessened in recent years, it is also not in Alexander's best interest to be labeled base-born or a bastard.[4]

I find that Tanson's motion to preclude Edward's intervention in this proceeding should be granted as being in the best interest of the child.

Accordingly, I grant both motions filed on behalf of Tanson.

---

[4] Illegitimate. *Webster's Encyclopedic Unabridged Dictionary*, 1989.